IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 1:09-CR-428-JEC |
| STEVEN R. BYERS | : | |

GOVERNMENT'S SENTENCING MEMORANDUM
AND MOTION FOR DOWNWARD DEPARTURE
FOR SUBSTANTIAL ASSISTANCE PURSUANT TO U.S.S.G. §5K1.1

Now comes the United States of America, by and through counsel, Sally Quillian Yates, United States Attorney and William L. McKinnon, Jr., Assistant United States Attorney, for the Northern District of Georgia, hereby submits the Government's Sentencing Memorandum and Motion for a Downward Departure for Substantial Assistance pursuant to U.S.S.G. §5K1.1, and states as follows:

Loss Amount

Byers objects to the loss calculation for Sentencing Guidelines purposes. (PSR ¶ 23). Byers correctly notes that in the negotiated plea agreement the parties agreed that the Government agreed that the loss amount would be between $400,000 and $1 million. The Government is bound by its agreement in the plea agreement and joins in Byers' objection that the loss amount should be between $400,000 and $1 million.

1

The Government's position on the amount of loss is based upon the following circumstances.  As the Court is aware from the PSR, Gary Goff, doing business as Cannon Services, paid kickbacks to Byers.  In exchange for the money Goff paid him, Byers fraudulently downgraded primary quality steel coils in the victim company's inventory and sold them to Goff at secondary quality prices.  Byers fraudulently downgraded coils in three ways.  In some instances he fraudulently changed the victim company's records regarding primary quality steel coils that had already been processed to make it appear that the coils were secondary quality rather than primary quality.  In other instances Byers identified excess uncoated master coils that were placed in storage to await future production orders.  These coils were designated as "RAC."  Byers also identified coils that had begun a production run, but the run was stopped during processing for a variety of possible reasons.  These coils were determined suitable for rerun and returned to storage and designated as "RRS." Both "RAC" and "RRS" coils were considered good coils that could be processed to prime product.  Byers would then have the "RAC" and "RRS" coils coated without a production order.  This was accomplished by using a verbal production order which would bypass the victim company's normal data entry procedures.  The processing of these coils would be of primary quality, but the coils would remain listed as "RAC" or "RRS" in the system, and then be fraudulently downgraded to secondary or scrap

quality.  Finally, Byers would identify raw, unpainted coils in the company's inventory.  These coils, referred to as "RAW" coils, were also processed using verbal production orders.  These coils were also primary quality coils, and they would remain as "RAW" coils in the system until they were fraudulently downgraded to secondary or scrap quality.  Regardless of the means by which the fraudulent downgrading occurred, Byers would sell Goff these primary quality coils at secondary quality prices, thereby causing a loss to his employer, the victim company.

The victim company conducted an internal investigation to determine its losses.  Because the company kept finished samples from every production run as a quality control measure, the company was able to identify coils that were of primary quality that had been fraudulently downgraded in the record keeping system to secondary quality and sold to Goff's company at secondary quality prices.  The company then prepared spreadsheets with respect to these particular coils in order to determine the loss resulting from the fraud.  The loss for each coil was determined simply by calculating the true value of the coil as a primary quality coil and deducting the price that Goff paid for it.

Because Byers was cooperating, Byers and his attorney and the case agents and the undersigned AUSA, jointly reviewed the spreadsheets.  Byers stated that any coils for which the price charged per pound (column Q in the spreadsheets) was less than $.12

was legitimate secondary or scrap quality, and should not be included in the loss calculation. The Government agreed to subtract the losses in the chart resulting from those coils from the loss amount for Sentencing Guidelines purposes. The loss attributable to those transactions is approximately $250,428.34. Subtracting that amount from the loss amount set out in paragraph 23 of the PSR ($1,131,359.73) reduces the loss amount to $880,931.39. Recently, the victim made adjustments to the spreadsheets that resulted in a further reduction of the loss amount by $89,569.15. Therefore, the loss for Sentencing Guidelines purposes should be $791,362.25. This loss results in a 14 level enhancement based on loss amount pursuant to U.S.S.G. § 2B1.1(b)(1)(H). Byers concedes in his objections to the PSR that a loss figure in the range of $400,000 to $1 million is acceptable to him.

Despite the above noted concession, Byers also contends that the loss figures from the spreadsheets is speculative, and therefore, the loss should be limited to $110,470.35, that is, the amount of the kickbacks Byers received. At sentencing the Government is prepared to present a witness from the victim company who will explain the methodology used to determine the losses reflected in the spreadsheets. The witness' explanation of the methodology the victim used to calculate the loss will address the

lack of specificity challenge that Byers raises to the loss calculation.

In challenging the loss figures, Byers argues that as part of the fraud he gave Goff inside information about secondary and scrap quality coils which were being sold by a competitive bid process and that the losses associated with those coils are speculative. While it is true that Byers has admitted to this conduct, the spreadsheets only include losses resulting from primary coils that were fraudulently downgraded to secondary coils. Therefore, the part of the scheme between Goff and Byers that involved Byers giving Goff inside information about legitimate secondary quality coils is not included in the loss calculation.

Byers also argues that the contract between the victim company and its customers allowed a certain percentage of downgrade without a penalty. While it is true that the contract allowed for a 3% scrap allowance, the scrap allowance was permitted for truly scrap or secondary quality processed coils. If a coil was a 100% primary quality, then according to the contract the customer was to receive the entire coil. There was no provision in the contract that authorized the victim company to fraudulently downgrade primary quality to secondary quality in order to take advantage of the scrap allowance. If there was such a provision, then there would have been no reason for Byers to "cook the books" to make it appear that primary quality coils were secondary quality. And, if there

was such a provision, the contract provision would have been intended to inure to the benefit of the victim company and not to the benefit of Byers and Goff.

If the Court were to accept Byers' argument the loss amount should be limited to the amount of the bribe, then the actual loss suffered by the victim would be grossly understated.   Therefore, the Court should find that the loss amount for Sentencing Guidelines purposes is $791,362.25.

Motion for Downward Departure for Substantial Assistance

Byers has provided substantial assistance to the Government. During the course of the investigation, counsel for the Government was contacted by Byers' attorney and advised that Byers wanted to admit his involvement in the kickback scheme and be debriefed. Byers was then debriefed twice by the undersigned AUSA and the case agents.   At the time of the initial debriefing the Government was aware of the payments made by Goff to Byers.   At the initial debriefing Byers admitted his involvement in the kickback scheme with Goff and provided details unknown to the Government about the specifics about what Byers did for Goff in exchange for the money that Goff paid him.   Had Goff gone to trial, Byers would have been a key witness for the Government.

Byers also provided information about the involvement and knowledge of other employees of the victim company in the scheme to

6

fraudulently downgrade primary quality coils to secondary quality. However, the Government was not able to corroborate Byers' information about these other employees' involvement to a sufficient degree so as charge the other individuals in the fraud scheme.

Finally, Byers has voluntarily assisted attorneys representing the victim company in the civil action filed by the victim company against a number of individuals and companies that allegedly committed fraud against the company, and in the ongoing investigation being conducted by the company's attorneys into the involvement of others in the fraud schemes perpetrated against the company.

Therefore, the Government respectfully requests that the Court grant this motion for downward departure, and reduce Byers' offense level by three levels. Based upon the Government's calculations, the offense level before a departure should be level 19, Byers' criminal history category is I, and his custody guideline range should be 30-37 months. A three level reduction would make Byers' custody guideline range 21-27 months. The Government further

recommends that the Court sentence Byers to the low end of the custody guideline range, that is, 21 months imprisonment.

                              Respectfully submitted,
                              SALLY QUILLIAN YATES
                              UNITED STATES ATTORNEY


                              /s/ William L. McKinnon
                              WILLIAM L. MCKINNON, JR.
                              ASSISTANT UNITED STATES ATTORNEY

                              600 RBR Federal Building
                              75 Spring Street, S.W.
                              Atlanta, Georgia  30365
                              (404) 581-6046
                              Fax 404-581-6181
                              Georgia Bar No.  495812